Hotel and Restaurant Employees' International Alliance, Local No. 122, and others, Appellants, vs. Wisconsin Employment Relations Board and others, Respondents.

*September 13, 1940—January 7, 1941.*

330

332

334

336

For the appellants there were briefs by *Padway, Goldberg & Tarrell,* and oral argument by *I. E. Goldberg* and *David Previant,* all of Milwaukee.

For the respondent Wisconsin Employment Relations Board there were briefs by the *Attorney General, James Ward Rector,* deputy attorney general, and *N. S. Boardman,* assistant attorney general, and oral argument by *Mr. Boardman.*

For the respondent Plankinton House Company there were briefs by *Richardson, Robertson, Reeder & Stearns,* attorneys, and *Herman M. Knoeller* of counsel, all of Milwaukee, and oral argument by *Mr. Knoeller.*

The following opinion was filed November 8, 1940:

ROSENBERRY, C. J.   By ch. 57, Laws of 1939, the legislature repealed ch. 111 of the statutes of 1937 and created a new chapter to be designated ch. 111. We shall state only so much of this chapter as is necessary to present the questions to be considered. The chapter provides that it may be cited as the Employment Peace Act.

Sec. 111.01, Stats. 1939, declares the public policy of the state as to employment relations and collective bargaining. It recognizes that there are three major interests involved, namely, that of the public, the employee, and the employer.

Sec. 111.02, Stats. 1939, defines certain terms used in the chapter:

"(5) 'Collective bargaining' is the negotiating by an employer and a majority of his employees in a collective-bargaining unit (or their representatives) concerning representation or terms and conditions of employment of such employees in a mutually genuine effort to reach an agreement with reference to the subject under negotiation.

"(6) The term 'collective-bargaining unit' shall mean all of the employees of one employer (employed within the state), except that where a majority of such employees engaged in a single craft, division, department or plant shall

have voted by secret ballot as provided in section 111.05 (2) to constitute such group a separate bargaining unit they shall be so considered. Two or more collective-bargaining units may bargain collectively through the same representative where a majority of the employees in each separate unit shall have voted by secret ballot as provided in section 111.05 (2) so to do. . . .

"(8) The term 'labor dispute' means any controversy be-between an employer and the majority of his employees in a collective-bargaining unit concerning the right or process or details of collective bargaining or the designation of representatives. Any organization with which either the employer or such majority is affiliated may be considered a party to the labor dispute."

Sec. 111.06, Stats. 1939, defines what are unfair labor practices:

"(1) [Not involved here.]
"(2) It shall be an unfair labor practice for an employee individually or in concert with others: . . .
"(e) To co-operate in engaging in, promoting or inducing picketing, boycotting or any other overt concomitant of a strike unless a majority in a collective-bargaining unit of the employees of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike. . . .
"(3) It shall be an unfair labor practice for any person to do or cause to be done on behalf of or in the interest of employers or employees, or in connection with or to influence the outcome of any controversy as to employment relations any act prohibited by subsections (1) and (2) of this section."

While the briefs on both sides contain much matter relating to the history, background, and philosophy of labor legislation, the *sole* contention made here is that sub. (2) (e), sec. 111.06, Stats. 1939, is unconstitutional and void, (1) because it contravenes the guaranties of free speech afforded by the Fourteenth amendment to the constitution of the

United States and section 3 of article I of the constitution of the state of Wisconsin; (2) because it does not constitute a valid exercise of the police power of the state since it is for the vindication of a private right and not a public right; (3) because it is indefinite and uncertain because it establishes no means or standards wherein and whereby the requisite balloting can be conducted and the results thereof ascertained, and is therefore incapable of application; and (4) because the terms "picketing" and "boycotting" are vague and indefinite; their use in the statute and order is not sufficient to apprize the unions as to what conduct is or is not prohibited.

In order to determine whether the Employment Peace Act is unconstitutional, it must first be construed. Petitioners argue that under the provisions of sub. (2) (e), of the act, sec. 111.06, Stats. 1939, and the order issued by the board pursuant thereto that individual employees are forbidden as individuals to do any of the things enumerated in the subsection except in support of an authorized strike. The legislature has very carefully and explicitly set out as an aid in the construction of the act what it intended to do in its declaration of policy. In addition to that, sec. 111.15, Stats. 1939, provides:

"Except as specifically provided in this chapter, nothing therein shall be construed so as to interfere with or impede or diminish in any way the right to strike or the right of individuals to work; nor shall anything in this chapter be so construed as to invade unlawfully the right to freedom of speech. And nothing in this chapter shall be so construed or applied as to deprive any employee of any unemployment benefit which he might otherwise be entitled to receive under chapter 108 of the statutes [unemployment benefits]."

The legislature also amended ch. 103, Stats., entitled "Employment Regulations," but did not amend or repeal sec. 103.53, Stats., which makes lawful the doing of certain

things in labor disputes. It also redefined the term "labor dispute" as found in ch. 103, as follows:

"103.62 (3) The term 'labor dispute' means any controversy between an employer and the majority of his employees in a collective-bargaining unit concerning the right or process or details of collective bargaining or the designation of representatives. Any organization with which either the employer or such majority is affiliated may. be considered a party to the labor dispute. The provisions of this subsection shall supersede any provision of the statutes in conflict therewith."

The act also established rules for determining when a case shall be held to involve or grow out of a labor dispute. The definition of "labor dispute," and the rules for determining when a case shall be held to involve or grow out of a labor dispute contained in ch. 57, Laws of 1939, are widely different in theory and purpose from like provisions to be found in the statutes of 1937, which they supplanted. Ch. 57 limits a labor dispute to a case where there is a controversy between an employer and a majority of his employees in a collective-bargaining unit. The definition contained in sec. 103.62 (3), Stats. 1937, was very much broader and much more inclusive than that contained in sec. 103.62 (3), Stats. 1939.

Upon the oral argument great stress was laid upon the fact that according to the terms of the act an employee was deprived of his constitutional right of freedom of speech. Appellants support their contention in this regard by reference to the case of *Thornhill v. Alabama* (1940), 310 U. S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093. Counsel, however, ignore the fact that the *Thornhill Case* dealt with a statute which prohibited loitering or picketing and declared picketing to be a misdemeanor. As construed by the state court it prohibited the publicizing of the facts of a labor dispute whether by printed sign, by pamphlet, by word of mouth, or

otherwise. The peace act deals with concert of action in carrying on an unauthorized strike by the usual overt acts concomitant of a strike.

The peace act, however, does not forbid picketing. It attempts to regulate it and to provide under what conditions and circumstances picketing may be carried on by striking employees. The peace act expressly provides that it shall not be so construed as to impair the right of free speech. One violating the provisions of the peace act is not guilty of a misdemeanor. His act is merely declared to be an unfair labor practice. The right to speak freely is guaranteed by the constitution, but that right, the same as other rights guaranteed by the constitution, is subject to limitations. In the exercise of that right one is not free from liability for libel, duress, or fraud, although speech was the agency in each case. *John F. Jelke Co. v. Beck* (1932), 208 Wis. 650, 242 N. W. 576; *Wisconsin Labor R. Board v. Fred Rueping L. Co.* (1938) 228 Wis. 473, 279 N. W. 673. See also *Schenck v. United States* (1919), 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470; *Gitlow v. New York* (1925), 268 U. S. 652, 45 Sup. Ct. 625, 69 L. Ed. 1138.

The act does not limit the right of an employee to speak freely. It declares co-operating in "engaging in, promoting or inducing picketing, boycotting," etc., in aid of an unauthorized strike, to be an unfair labor practice. The fact that an employee in the course of doing the designated acts may use speech as a means of carrying on his activities, does not bring the acts within the protection of the constitutional guaranties of free speech. The term "picketing," as used in sub. (2) (e), sec. 111.06, Stats. 1939, does not include acts held in the *Thornhill Case, supra,* to be within the protection of the constitutional guaranty of the right of free speech. The express language of the act forbids such a construction. It clearly refers to that kind of picketing which the *Thorn-*

*hill Case* says the state has power to deal with "as a part of
its power to preserve the peace, and protect the privacy, the
lives and the property of its residents."

Par. (e) by its terms does not apply to an individual. An
individual cannot co-operate with himself. Par. (e) does not
forbid an employee to quit his employment individually or
in concert with others. It does not forbid an employee singly
or in concert with others from bringing about a vote by a
collective-bargaining unit as to whether there shall be a
strike. By the act strikes are divided into two classes,—
authorized and unauthorized. Par. (e) has no application
except in the case of an unauthorized strike. It is the act of
co-operating in engaging in, promoting or inducing picket-
ing, boycotting, or other overt acts in support of an unau-
thorized strike that par. (e) declares to be an unfair labor
practice. Nowhere in the act is it declared that engaging in,
promoting, or inducing picketing, boycotting, or any other
act concomitant of a strike shall be deemed to be an unlawful
act. It is declared merely to be an unfair labor practice. Our
attention has been called to a decision of the supreme court of
the state of Oregon, *American Federation of Labor v. Bain*
(Or.), 106 Pac. (2d) 544, decided October 22, 1940. The
statute under consideration in that case was widely different
from ch. 111, Stats. 1939. In construing this statute the
supreme court of Oregon said (106 Pac. (2d) 544, 554) :

"In the statute there is no definition of the word 'picket.'
It is a word of 'vague contours,' as the supreme court said
in the *Thornhill Case,* and doubtless may be used to indicate
conduct of a noxious character with which the state has
power to deal. But it also embraces activities which the su-
preme court holds the state may not lawfully suppress. It
includes, we think, the conduct of one who walks or patrols
in the vicinity of a place of business involved in a labor dis-
pute, and by word of mouth, banner or placard, undertakes to
give information to the public concerning such dispute. The
conduct of such person may be peaceful or otherwise; his

demeanor orderly or threatening; the information true or false. The activity may be, and usually is, incident to an organized effort to prevail in the controversy, and we concur in the view of counsel for the defendants that it was precisely picketing by a member of a labor union and on behalf of his organization that the voters had in mind when they enacted this law. But that the activities embraced by the word 'picket' were intended to include such as are free from violence, intimidation and fraud,—what is ordinarily called 'peaceable picketing'—we think there can be no doubt. It follows that the very type of conduct which the supreme court held in the *Thornhill* and *Carlson Cases* to be protected by the Fourteenth amendment, is denounced by the Oregon statute unless engaged in incident to a controversy relative to wages, hours or working conditions, between an employer and a majority of his employees."

As already pointed out, the Wisconsin statute expressly provides that it shall be so construed and applied that it shall not interfere with the right of free speech. As we understand and construe the statute, the right of free speech is not interfered with. The conduct complained of in this case, and described as "picketing," was not the sort of conduct that was indulged in by the defendant in the *Thornhill Case, supra.* The conduct complained of in this case and dealt with by the board and by the court was of an entirely different character. It was mass picketing, organized and carried on by the unions supplemented by boycott and violence, and was clearly within the exception stated in the *Thornhill Case* warranting state action. In that case the supreme court of the United States said (p. 105):

"We are not now concerned with picketing *en masse* or otherwise conducted which might occasion such imminent and aggravated danger to these interests as to justify a statute narrowly drawn to cover the precise situation giving rise to the danger."

Ch. 111, Stats. 1939, is a statute of that character. We do not understand the decisions of the United States supreme

court to mean that there can be no regulation of the right of picketing. That court has not yet said that a person who goes upon the premises of another for the purpose of creating a disturbance and disorganizing the other's business, is protected in the doing of such acts by the constitutional guaranty of free speech. In this case it is undisputed that numerous assaults were committed by pickets; that the pickets acted in concert; that the fines of these pickets were paid by the unions; that ingress and egress to and from the premises of the employer were prevented by force and arms. It was at conduct of that kind that the statute was aimed. It is conduct of that kind that is dealt with in this case. It is conduct of that kind that is declared to be an unfair labor practice by the statute, and from which the defendants are ordered to cease and desist. The statute does not even declare conduct of that kind to be unlawful, nor does it subject the offender to a criminal prosecution. In this respect it differs fundamentally from the statute that the Oregon supreme court had under consideration.

The effect of pursuing a course of conduct which under the statute amounts to an unfair labor practice is:

(1) To subject the actor to the provisions of sec. 111.07, Stats. 1939. Under it he may upon complaint be brought before the board where he may answer the complaint and appear in person or otherwise at the hearing, of which a full and complete record is required to be kept. After the final hearing the board is required promptly to make and file its findings. The board may by its final order dismiss the charges or require the person complained of to cease and desist from the unfair labor practice found to have been committed, suspend his rights of immunities, privileges, or remedies granted or afforded by the chapter for not more than a year, and require him to take such affirmative action, including reinstatement of employees with or without pay, as the board

may deem proper. The determination of the board may be enforced by the judgment of the circuit court.

(2) When a person is found guilty of an unfair labor practice he loses the benefit of sec. 103.53, Stats. 1939, which prescribes what acts, whether performed singly or in concert, shall be legal in the conduct of a labor dispute. He is thereby remitted to his rights under the constitution, other statutes, and the common law. This is recognized in sec. 111.07 (1), which provides, in part:

"Nothing herein shall prevent the pursuit of legal or equitable relief in courts of competent jurisdiction."

This exception, of course, applies to the employee, employer, or any person connected with a particular controversy as described in sec. 111.06 (3), Stats. 1939.

(3) An employee who is guilty of an unfair labor practice may lose his status as an "employee" as defined in sec. 111.02 (3), Stats. 1939.

No rights of a person guilty of an unfair labor practice are invaded until there has been a final determination by the board. The statute is not self-executing. It merely provides the machinery by which certain described labor practices may, after due hearing, be held to be unfair, and the person complained of ordered to cease and desist therefrom. Nothing in the act prevents or was intended to prevent employees from making such demands upon their employer as they think the circumstances warrant. Whether such employees act singly or in concert they are within their rights in making such demands upon their employer. We find nothing in the act which prevents a minority of a collective-bargaining unit from withdrawing from employment either singly or in concert. They are not guilty of an unfair labor practice in so doing. But if they attempt to coerce their employer by concerted picketing, a boycott, or by any other similar overt act con-

comitant of a strike, they will be guilty of an unfair labor practice as defined in the act. We say similar overt act because the maxim of *ejusdem generis* applies. *Chicago & N. W. R. Co. v. Railroad Comm.* (1916) 162 Wis. 91, 155 N. W. 941.

The petitioners complain that the characterization of the acts of employees as unfair labor practices cannot be made to depend on the action of a majority of a collective-bargaining unit; that the legislature cannot place it within the power of a majority of the collective-bargaining unit to authorize a strike. This argument is an attack upon a principle which is fundamental in the attempt of the legislature and of congress to regulate labor relations. The principle upon which authorized collective bargaining depends is that the rule of the majority within an appropriate collective-bargaining unit shall bind the minority. We see no way by which the principle of collective bargaining can be maintained unless this right of a majority of a collective-bargaining unit to speak for the unit including the minority is maintained. A bargain on behalf of a collective-bargaining unit amounts to nothing, if after it is made the individuals or some of them comprising that unit are not affected thereby. This principle is explicit in the National Labor Relations Act, in the Railway Labor Peace Act, and in the act now under consideration. If the majority of a collective-bargaining unit can thus coerce the minority in the matter of bargaining, we see no reason why the legislature may not vest in a majority of the unit power to determine whether such conditions obtain in the employment as warrant the calling of a strike in an effort to remedy them. There is no more delegation of legislative power in the one case than there is in the other. It is in most cases the same majority that made the bargain for the unit that determines whether a strike shall be called. We see in this no delegation of legislative power. Whether the conditions are such

in the employment as justify the employees in striking is a matter more particularly within the knowledge of the employees than anyone else, and is in the last analysis merely a question of fact. A vote of the majority of the employees in a collective-bargaining unit to strike is a determination that facts exist which justify it. When such a determination is made, sub. (2) (e), sec. 111.06, Stats. 1939, does not apply. The method of determining when a strike is justifiable is almost identical with the method provided for the submission to a municipality of whether a particular law shall be effective within that municipality. The electors determine upon the basis of their own knowledge whether conditions are such as to make the operation of the law within the municipality desirable and conducive to the general welfare. That also is a question of fact. When a majority have voted to call a strike, the means and methods of coercion which they may employ are not unlimited or unrestricted. Less than a majority may strike, but they will be under the restrictions of the statutes as to the methods of coercion which they may use. Sec. 103.53 specifies with particularity what may be considered legal in the conduct of a labor dispute. These enumerated means striking employees not guilty of an unfair labor practice are at liberty to employ. Any court or judge is forbidden to restrain the doing of such acts when done in connection with a labor dispute. The sole difference between coercive acts in support of a strike which has been called by a majority of members of a collective-bargaining unit and one which has not been so called is that the members of a minority group do not have the benefit of sec. 103.53, that is, by indulging in an unauthorized strike they lose their privileges under that section and are subject to the provisions of ch. 111, Stats. 1939, relating to unfair labor practices. The character of their coercive acts must then be determined either by submitting the controversy to the board or by "the pursuit of

legal or equitable remedies in courts of competent jurisdiction." If one merely withdraws from his employment he is not subject to the act.

On behalf of the appellants fear is expressed that a—

"servile, docile or moribund majority refuses to place its stamp of approval, to grant a license, to the carrying on of peaceful, truthful appeals to the public."

This argument seems to disregard the fact that the question of whether intolerable working conditions, oppressive wages, or killing hours need correction is submitted to a majority of the group which must be suffering under these same conditions, the majority cannot by their action impose anything upon a minority that they do not by the same action impose upon themselves.

There is nothing in the history of the labor movement to warrant any fear that labor will be servile, docile, or moribund. On the contrary, no group within the body politic has shown itself more willing to stand upon its rights and sacrifice present advantage for future benefits than has labor.

The petitioners further contend that the cease-and-desist order is too broad; that even though the petitioners have been found guilty of unlawful labor practices in the conduct of their unauthorized strike, that all picketing and boycotting cannot be forbidden by the board, and cite as authority for their contention, *May's Furs & Ready-To-Wear, Inc., v. Bauer* (1940), 282 N. Y. 331, 26 N. E. (2d) 279. The proceeding in the *May's v. Bauer Case* was one for injunctive relief. This contention is based on the assumption that the rules which apply to a court in granting injunctive relief apply in the hearing before the board. In the *May's Case,* the employer sought an injunction in a court of equity. The court said (p. 337):

"Upon this appeal there is involved the scope and application of a legislative enactment whose wisdom or lack of

wisdom is not a consideration open to judicial inquiry. Subject only to constitutional restrictions, it is the duty of this court to apply the statute as enacted by the legislature."

The question decided was that the statutes of the state of New York, providing that the court should not issue injunctions in a case growing out of a labor dispute except in accordance with the provisions of the statute, were controlling; that under the statute the court could not enjoin lawful acts committed in support of a strike. We have a similar statute in Wisconsin (sec. 103.56), but by sec. 111.17, Stats. 1939, it is provided that the provisions of ch. 111, Stats. 1939, shall prevail wherever they conflict with the provisions of other statutes. This court is under the same duty to declare the law in accordance with the provisions of ch. 111 that the court of the state of New York was under to declare the law in respect to injunctions in labor disputes and for the same reasons.

It is argued that the terms "picketing" and "boycotting" are so vague, indefinite, and uncertain as to render sub. (2) (e), sec. 111.06, Stats. 1939, void. In support of that argument cases relating to the construction of statutes defining criminal offenses are cited. Ch. 111, Stats. 1939, creates no criminal offenses. Violation of any of its terms does not subject the actor to criminal prosecution. The board is charged with the duty of enforcing the act. The power of the board relating to enforcement does not arise until some party in interest has filed a complaint in writing.

There can be no question but that the purpose of the legislature in enacting ch. 111, Stats. 1939, was widely different from the purpose which actuated it in the enactment of ch. 111, Stats. 1937, which was repealed. It appears from the briefs that much complaint was made because ch. 111, Stats. 1937, made no provision with respect to unfair labor practices by employees. In providing for "industrial peace, regular and adequate income for the employee, and uninterrupted

production of goods and services" (sec. 111.01 (2), Stats. 1939), we see no reason why the legislature may not forbid concerted picketing and boycotting in aid of an unauthorized strike. Under sec. 103.51 *et seq.,* Stats. 1937, it was held that the plant of an employer might be picketed although there was no dispute between him and his employees and the employer employed no members of the union. *American Furn. Co. v. I. B. of T. C. & H. of A.* (1936) 222 Wis. 338, 268 N. W. 250. Under the same statute it was held that a labor union might conduct picketing operations for the purpose of coercing an employer to desist from performing work in his own business and in connection with projects undertaken by him. *Senn v. Tile Layers Protective Union* (1936), 222 Wis. 383, 268 N. W. 270, 268 N. W. 872. It is apparent that the legislature was of the view that too wide a latitude was given to employees in their attempts to coerce their employers. All these questions relating to rights of employees to organize, conduct strikes, boycotts, and other coercive measures are in the field of public policy. As the court of appeals of New York said in the case already cited, and as this court has said many, many times, these questions are for the legislature. Courts do not sit to pass upon the wisdom or unwisdom of the acts of the legislature. In order to preserve order and prevent breaches of the peace, and assure to all citizens their lawful rights, the legislature may well forbid the doing of acts which under other circumstances would be lawful. The acts committed by the petitioners, as shown by the findings in this case, would have justified injunctive relief under the common law or any labor-relations statute, either state or federal.

While in the absence of legislation it was necessary for the court to declare public policy in controversies relating to labor relations, when the legislature acts within the constitutional limits of its power, its mandates supersede court decisions and control as to future controversies. Both parties to a labor dispute are under the same constitution and both are

subject to the valid acts of the legislature. Just where the line should be drawn in an effort to balance the bargaining power of the parties is primarily a matter of public policy for the legislature and not a question of law for the courts.

We discover no invasion of the right of freedom of speech either in sub. (2) (e), sec. 111.06, Stats. 1939, or in the way the law was administered by the board in this case. The right of the individual to freedom of speech is by the terms of the act left unimpaired. It is the right to concert of action that is regulated. Nor do we discover any such uncertainty or indefiniteness in the law as to render it invalid. While it is true that the terms "picketing" and "boycotting" are not terms of definite legal content, they are descriptive of a process well known to the law, and when considered in connection with the other provisions of chs. 111 and 103, Stats. 1939, the meaning of these terms becomes reasonably certain.

The statute is one providing for the regulation and protection of civil rights, and therefore does not partake of the nature of a criminal statute. By engaging in an unauthorized strike an employee may lose his status as an employee. He then has the same rights and is subject to the same liabilities as a third person. When he thus withdraws from his employment he is free to speak, but his right to coerce his former employer is limited by the act. Except as his acts affect the employer he is under no restraint. It is true that the act limits the use of coercive measures as they have ordinarily been used in labor disputes, but that is a matter for the legislature. It is not within the province of the court to pass upon the wisdom or unwisdom of the public policy declared by the legislature.

Since we interpret the order of the board to be coextensive with the statute as construed, we find it unnecessary to modify the order or judgment.

*By the Court.*—Judgment affirmed.

The following opinion was filed January 7, 1941:

ROSENBERRY, C. J. (*on motion for rehearing*). On this motion appellants open their argument with the following statement:

"Since receipt of the supreme court's decision we have gone over it carefully and searchingly in order that we might have a clear and precise understanding of the basis for such decision.

"Only one thing was clear. That was that the Wisconsin supreme court, traditionally liberal and traditionally alert to protect the civil liberties of the citizens of this state, had placed its stamp of approval upon a statute, and an order based thereon, prohibiting minority groups from engaging in those rights guaranteed by the constitution of the United States. This for the sole reason that they were minority groups."

What counsel refer to is their claim that the act which provides that what is denominated in the opinion "an unauthorized strike," that is, one not made pursuant to a majority vote of employees, is an unfair labor practice, deprives the minority group of a constitutional right to strike and infringes the right of free speech. It is almost futile to attempt to reply to a contention of this kind in the face of the provisions of the statute and the explicit language of the opinion. Counsel continue to misinterpret the statute and, as a consequence, misunderstand the opinion.

Section 111.15 of the Employment Peace Act provides, among other things:

"Except as specifically provided in this chapter, nothing therein shall be construed so as to *interfere with or impede or diminish in any way the right to strike* . . .; nor shall anything in this chapter be so construed as to *invade unlawfully the right to freedom of speech.*"

The last sentence contained in the opinion is—

"Since we interpret the order of the board to be coextensive with the statute as construed, we find it unnecessary to modify the order or judgment."

It is explicitly stated in the opinion that the order of the board, the judgment of the circuit court affirming it, and the opinion of this court did not deal with anything approaching peaceful picketing. We pointed out—

"In this case it is undisputed that numerous assaults were committed by pickets; that the pickets acted in concert; that the fines of these pickets were paid by the unions; that ingress and egress to and from the premises of the employer were prevented by force and arms. It was at conduct of that kind that the statute was aimed. It is conduct of that kind that is dealt with in this case. It is conduct of that kind that is declared to be an unfair labor practice by the statute, and from which the defendants are ordered to cease and desist. The statute does not even declare conduct of that kind to be unlawful, nor does it subject the offender to a criminal prosecution."

How this can be tortured into a statement that minority groups are, by the order affirmed in this case, prohibited from peaceful picketing as described in the *Thornhill Case,* is beyond our understanding. Under the statute and the order of the board as interpreted and construed by the explicit language of the opinion, freedom of speech and the right peacefully to picket is in no way interfered with. The appellants could not be ordered to cease and desist from something they were not engaged in.

We did not deal with every provision contained in the Employment Peace Act for the reason, as stated in the opinion, upon this appeal sec. 111.06 (2) (e), Stats. 1939, was the only section of the statute drawn in question and it is with the construction of that section that we deal and it is explicitly so stated in the opinion. We did not attempt, because it was not involved in this case, to distinguish between what a majority group may do in carrying on a strike from what the minority group may do. We pointed out that the statute nowhere prohibited employees from withdrawing from their employment either singly or in groups and certainly it in no

way interferes with the right of free speech. Par. (e), as construed, does not prohibit, as described in the *Thornhill Case,* peaceful picketing. We may say this, however, that the statute does not authorize the majority group, even though it has voted to strike, to commit acts of violence, to take possession of the employer's property and forcibly to prevent ingress and egress to and from the premises.

The appellant employees, unions, and officers are not in a position in this case to raise any question respecting the right peacefully to picket or the right of free speech. The picketing carried on in this case was not peaceful and the right of free speech is in no way infringed by the statute or the order of the board.

This court does not seek applause on the ground that it is progressive and liberal, or indeed, upon any other ground. The court has, however, a duty, fairly and impartially to apply and interpret the law in all cases where the rights of citizens are involved to the end that their rights under the constitution and the law may be preserved to them inviolate. This duty it strives to discharge with fidelity to the law and the constitution. As we said in *American Furn. Co. v. I.¹ B. of T. C. & H. of A.* (1936) 222 Wis. 338, 365, 268 N. W. 250, 106 A. L. R. 335:

"We conclude that the act as we construe it . . . is a valid exercise of legislative power. . . . Whether such laws constitute a wise solution may, of course, be fairly put in question, but the forum for such a controversy is the legislature and not the courts. The question is irrelevant here, and we cannot resist the conclusion that one of the purposes of the labor code was to make it so and to substitute a legislative declaration of policy for the varying standards and views theretofore expressed in judicial opinions."

*By the Court.*—Motion denied with $25 costs.