INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL NO. 3 v. UTAH
LABOR RELATIONS BOARD et al.

No. 7114.  Decided February 25, 1949.  (203 P. 2d 404.)

See 16 C. J. S., Constitutional Law, sec. 213; 31 Am. Jur. 943. Lawful or proper purpose of peaceful picketing as condition of guaranty of claim of free speech, note, 174 A. L. R. 593.

*F. Henri Henriod,* of Salt Lake City, for plaintiff.

*Grover A. Giles,* Atty. Gen., and *Allan Mecham,* of Salt Lake City, for defendants.

*Callister, Callister & Lewis* and *Clarence M. Beck,* all of Salt Lake City, amici curiae.

WOLFE, Justice.

Review of an order of the Utah Labor Relations Board commanding plaintiff union to cease and desist from certain acts designated as unfair labor practices by Section 49-1-16(2), U. C. A. 1943, as amended, Laws 1947, c. 66. In this opinion we shall refer to plaintiff, International Union of Operating Engineers, Local No. 3, as the union; to defendant, Utah Labor Relations Board, as the board; and to defendant, Palfreyman Construction Co., as the company. In determining this case we have been assisted not only by the briefs of counsel for the parties, but also by briefs filed by counsel for the Industrial Relations Council and

counsel for the Utah State Federation of Labor and Salt Lake Federation of Labor as amici curiae.

The union is a "labor organization" within the meaning of Section 49-1-10(5), U. C. A. 1943, and the company is a Utah corporation.

From July 1, 1946, to March 26, 1947, the union had a contract with the company providing for wages, hours, and working conditions. The contract provided that its terms should continue in effect until June 26, 1947, for any work not completed on the termination date. On March 26, 1947, the company was engaged in constructing a road near Henefer, Utah, known as the "Pioneer Memorial Trail." Nine members of the union employed by the company were working on this project. The company also employed many laborers who were not members of the union, nor of any labor union. The work not being completed on March 26, 1947, the contract was, by its own terms, to continue in force to June 26, 1947.

No new contract was negotiated, and as a result of this, a work stoppage occurred on July 8, 1947, on the company's operations on the highway project. However, full operations were resumed by July 11th.

On July 10, 1947, the company filed with the board a charge, setting forth that the union had blockaded the road; that union officials had threatened to coerce and blacklist employees of the company; that the company employed 40 men on this particular job, only nine of whom were members of the union; that there had been no certification by the union of its members on the job; that the company was hesitant to sign a union shop agreement until the union could show representation of a majority of the company's employees; that the company was paying the union wage scale and complying with all working rules of the union, but refused to sign a contract for fear of being guilty of conspiracy to force non-union men to join the union; and that the union was guilty of violating Section 49-1-16(2)

(a, b, c), U. C. A. 1943, as amended, Laws 1947, c. 66, and therefore was guilty of unfair labor practices.

Because frequent reference will be made to Section 49-1-16(2) in this opinion, we set out, at this juncture, the relevant portions of that statute, which provides as follows:

"(2) It shall be an unfair labor practice for an employe individually or in concert with others:

"(a) To coerce or intimidate an employee in the enjoyment of his legal rights, including those guaranteed in Section 49-1-15, * * *

"(b) To coerce, intimidate or induce any employer to interfere with any of his employees in the enjoyment of their legal rights, including those guaranteed in Section 49-1-15, or to engage in any practice with regard to his employees which would constitute an unfair labor practice if undertaken by him on his own initiative.

"(c) To cooperate in engaging in, promoting, or inducing picketing (not constituting an exercise of constitutionally guaranteed free speech), boycotting or any other overt concomitant of a strike unless a majority in a collective bargaining unit of the employees of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike.

"(d) To hinder or prevent, by mass picketing, threats, intimidation, force, or coercion of any kind the pursuit of any lawful work or employment, or to obstruct or interfere with entrance to or egress from any place of employment, or to obstruct or interfere with free and uninterrupted use of public roads, streets, highways, railways, airports, or other ways of travel or conveyance. * * *"

On July 11th, a representative of the board made a preliminary investigation in consequence of which the board issued a complaint naming the company as complainant and the union as respondent. The material portions of the complaint are as follows:

"3. That said union, through its agents, C. L. Casebolt and others whose names are unknown to the board, did blockade a public roadway and stop conveyances transporting employees of Complainant engaged in road construction to their place of work, at, or about 5:00 A. M., July 8, 1947, thereby engaging in mass picketing, intimidation and coercion of employees in their pusuit of lawful employment, contrary to and in violation of Title 49-1-16, Subsection (2) (d). [Sic]

4. That Respondent made certain threats of punishment and threats of violence upon workmen for following their course of employment

contrary to Respondent's wishes, whom it does not represent lawfully for the purposes of collective bargaining, and did intimidate said workmen near Henefer, Utah, on or about July 8, 1947, and by such conduct did interfere with the legal rights of said workmen and guaranteed under Title 49-1-15 and 49-1-16(2) (a). [Sic]

"5. That the union did not represent a majority of the company's employees and had no legal right to engage in a strike, or to call the company's employees off the job, in violation of Section 49-1-16(2) (c).

"6. That the union on July 8, 1947, attempted to obtain a contract from the company 'by force, coercion and intimidation,' expressed in work stoppages called and promoted by Respondent; all contrary to and in violation of Title 49-1-16(2) (b). [Sic]"

On July 22nd, the union filed its answer, denying all of the allegations of the complaint above set forth, and affirmatively alleging that if there was any blockade of the road it was caused by Jackson, an officer of the company; that there was no picketing, intimidation or coercion; that the union had advised members of the refusal of the company to sign a contract, and notified them to stop work; that there was no intimidation of members or non-members of the union; that the union represented a majority of the employees under the classification for which the union was representative, and that the company recognized the union as bargaining agent for its employees; that the members of the union authorized it to negotiate a new contract with the company; that the company refused to negotiate with the union, and was thereby guilty of an unfair labor practice; and that any words spoken by union representatives were in the exercise of constitutionally guaranteed free speech.

Hearing of the matter commenced on July 28, 1947. At the conclusion of the hearing, counsel for the company requested that the complaint be amended to conform to the proof. Thereafter an amended complaint was filed by the board, but no copy or notice thereof was served upon counsel for the union, and no opportunity was given to answer to the amended complaint. The substance of the amended complaint was that the business representatives and agents of the union cooperated in engaging and pro-

moting picketing directed primarily against the company and its employees without the majority of the employees in a collective bargaining unit having voted by secret ballot in favor of a strike against the company contrary to Section 49-1-16(2) (c) and that the business agents of the union blockaded a public roadway and stopped and interfered with conveyances transporting employees of the company, viz., Bob Calderwood and others, and intimidated Calderwood and interfered with Calderwood and others in the free and uninterrupted use of a public road near Henefer, Utah, contrary to Section 49-1-16 (2) (d), U. C. A. 1943.

The findings of fact made by the board were in substance that the business agents of the union placed an automobile with a picket sign on it on or near the roadway near the company's road construction activities and thereby engaged in picketing against the company and its employees, and indicated to the company's employees that a strike against the company was in progress without having first taken a secret ballot contrary to Section 49-1-16(2) (c) ; that a work stoppage occurred among employees of the company on July 8, 1947 as a direct result of the visit of the business agents of the union, which effectively stopped the company's operations that day involving the labor of approximately 40 employees of company; that the union representatives blockaded a public highway by stopping conveyances transporting employees of the company, namely, Bob Calderwood and others, and did intimidate Calderwood from working July 8, 1947, and interfered with Calderwood and others in their free and uninterrupted use of a public roadway in pursuit of lawful employment contrary to Section 49-1-16(2) (d) and that the union represented nine of fourteen employees engaged by the company as shovel operators, patrol operators, "cat" operators and mechanics on July 8, 1947 for purpose of collective bargaining.

In pursuance of these findings the board issued its order to the union to cease and desist from picketing the com-

pany's operations on the Henefer roadway, and from striking or inducing employees to strike against the company or to cease or delay work in any manner until compliance with Section 49-1-16(2) (c); to cease and desist from intimidating employees of the company engaged in work on the Henefer roadway; and to cease and desist from interfering with the free and uninterrupted use of the highway by employees of the company.

To review the proceedings before the board, we issued a writ of review, pursuant to the provisions of Section 49-1-18(f), U. C. A. 1943.

The union has assigned numerous errors relating to the regularity of the proceedings before the board. To treat all of the questions thereby raised, would be to unduly lengthen this opinion to no useful purpose. Suffice it to say that we have carefully examined all of the questions presented in that regard and while we are of the opinion that the proceedings before the board were far from exemplary, and in some respects subject to severe criticism, the record discloses no irregularities, improprieties, or errors in the procedings themselves of such nature as to require that the order of the board be set aside. As to whether the board has committed errors relating to the application of the law, we now take up hereunder.

The assignment of error principally relied upon by the union is that section 49-1-16(2) (c), U. C. A. 1943, is unconstitutional. That statute provides as follows:

"(2) It shall be an unfair labor practice for an employe individually or in concert with others:

\*    \*    \*    \*    \*

"(c) To cooperate in engaging in, promoting, or inducing picketing (not constituting an exercise of constitutionally guaranteed free speech), boycotting or any other overt concomitant of a strike unless a majority in a collective bargaining unit of the employees of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike."

The union contends that this statute deprives it of its constitutional right of free speech, guaranteed by the First and Fourteenth Amendments to the Constitution of the United States and Article I, Section 1, Constitution of Utah. The company, on the other hand, argues that the statute merely imposes a reasonable regulation on the right to picket, and therefore falls within the police powers of the state. Counsel for both sides have cited to us a multitude of cases treating this question. We have examined all of these authorities, but no attempt will be made to discuss all of them in this opinion. It should be noted here that the position taken in the brief of the union is slightly different from that taken by the Utah State Federation of Labor as amicus curiae. The former apparently takes the position that peaceful picketing, as a form of free expression, is an absolute right, not subject to any restraint by the state. The latter concedes that peaceful picketing, as a phase of the right of free speech, is subject to reasonable police regulation by the state for the benefit and protection of its citizens, but argues that the restraints and limitations imposed by the statute in this case are unreasonable, and hence unconstitutional.

It may be noted here that none of the constitutional guarantees embodied in the first eight amendments to the Constitution of the United States are absolute rights. All of them are subject to some regulation by the state. To consider them as absolutes would be, in effect, to deny to the states any police power. For example, the right of the citizens to bear arms shall not be infringed, yet most if not all of the states, and most municipal corporations as well, have enacted statutes and ordinances which severely curb the exercise of the right by the citizens. Freedom of religion has never been considered to be so absolute as to be beyond some regulation, and the practice of polygamy, human sacrifice, nudism, or other practices deemed so morally reprehensible as to be shocking to the conscience of the community may be restrained, even though practiced in the name of religion.

Many police regulations involve, to some extent, a limitation on one or more of the rights guaranteed to the individual by the constitution. This conflict between the interest of the private citizen and the interest of the state, was well stated by Mr. Justice Roberts in *Nebbia* v. *New York*, 291 U. S. 502, 54 S. Ct. 505, 510, 78 L. Ed. 940, 89 A. L. R. 1469:

"But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest.

&ast; &ast; &ast; &ast; &ast;

"These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need.

"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be obtained."

Like the other fundamental rights guaranteed in the Bill of Rights, the right of free speech is, and always has been, subject to reasonable regulation by the state when it collides with more paramount public interest. Thus the right of free speech does not include the right to speak in a loud and boisterous manner in a residential section during hours of the day or night when citizens of the community are ordinarily asleep or at rest. The use of profane, obscene, or blasphemous language may be suppressed. There is both civil and criminal responsi-

bility for slanderous utterances. And as said by Mr. Justice Holmes in *Schenck* v. *United States,* 249 U. S. 47, 52, 39 S. Ct. 247, 249, 63 L. Ed. 470, 473:

"The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic."

It must be recognized that picketing, as an exercise of the right of free speech, is subject to police regulation by the state. We are aware of no decision, either of the Supreme Court of the United States, or of any state ■ court, which has either held or inferred to the contrary. In fact in nearly every opinion treating the subject which has come to our attention, the court has specifically pointed out the right of the state to regulate picketing.

In *Stapleton* v. *Mitchell,* D. C., 60 F. Supp. 51, 63, the court sustained in part, and held invalid in part, a Kansas statute providing comprehensive regulations for labor relations disputes. Mr. Justice Huxman dissented in part, on the grounds that the statute was unconstitutional in its entirety, but he clearly recognized, and stated in vigorous language the right of the state to impose controls in labor union activities. Said he:

"No one can intelligently challenge the right of government to regulate labor unions. It may regulate chambers of commerce, church organizations, or any of the innumerable associations formed for the mutual benefit of the members, when such activities come into conflict with public interest or the reasonable rights of others. So the State may, by appropriate regulation, protect laborers eligible to membership in unions against exploitation by unscrupulous agents, against exaction of unreasonable dues, or against fraud, or in many other ways, the same as it may protect the public against quacks of all kinds or as it may protect one business man against unfair trade practices by his competitor."

The inquiry in this case, as in all other cases involving this question, must be, not did the state have power to regulate, but does the regulation imposed or attempted to be imposed by the state exceed the permissible limits of

regulation, so as to amount to a denial of a constitutional right?

Historically picketing has been considered as a tort. *Retail Clerks' Union* v. *Wisconsin Employment Relations Board*, 242 Wis. 21, 6 N. W. 2d 698. Only recently has picketing been identified with the right of free speech. The notion seems to have been first advanced in the opinion of the Supreme Court of the United States in the case of *Senn* v. *Tile Layers Protective Union*, 301 U. S. 468, 57 S. Ct. 857, 81 L. Ed. 1229, and it was definitely established as a principle of American constitutional jurisprudence in *Thornhill* v. *Alabama*, 310 U. S. 88, 60 S. Ct. 736, 745, 84 L. Ed. 1093. The assimilation of picketing to the right of free speech has given rise to a host of new legal problems and has resulted in many new legal concepts in the past ten years. The validity of the doctrine has been seriously questioned in the opinions of many state courts and some of the lower federal courts. And see also the criticism of the doctrine by Mr. Ludwig Teller in his work on Labor Disputes and Collective Bargaining. See Vol. 1, Section 136, p. 426 et seq. But the Supreme Court of the United States stands as the final arbiter of all quetions relating to rights guaranteed by the federal constitution and it having established certain rules and concepts, it is our duty to determine cases coming before us and involving the same questions, in accordance with the principles now established.

In *Thornhill* v. *Alabama,* supra, the court held unconstitutional a state statute making loitering and picketing a misdemeanor. The statute applied to all picketing, regardless of when, where, how, or for what purpose carried on. Said the court,

"The power and the duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents cannot be doubted. But no clear and present danger of destruction of life or property, or invasion of the right of privacy, or breach of the peace can be thought to be inherent in the

activities of every person who approaches the premises of an employer and publicizes the facts of a labor dispute involving the latter."

Immediately following the Thornhill case was *Carlson* v. *California,* 310 U. S. 106, 60 S. Ct. 746, 84 L. Ed. 1104, in which the court held unconstitutional an ordinance of Shasta County, California. The ordinance made it unlawful for any person to picket in front of any works, factory, place of business or employment for the purpose of inducing or influencing, or attempting to induce or influence any person to refrain from entering such works, etc. On authority of the Thornhill case, the ordinance was struck down.

In *Milkwagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 61 S. Ct. 552, 558, 85 L. Ed. 836, a state court injunction against even peaceful picketing was affirmed. The principle there laid down was that even peaceful picketing may be enjoined, when it is enmeshed with contemporaneously violent conduct. In that case not only had the union carried on peaceful picketing against certain dairies and others, but had also engaged in numerous and diverse acts of violence over a long period of time, including window smashing, bombing, wrecking of trucks, beating of drivers, arson, shooting, and threats of shooting. To enjoin this the dairies commenced injunction proceedings against the union. The trial court enjoined all acts of violence, but refused to enjoin peaceful picketing. On appeal, the Supreme Court of Illinois, 371 Ill. 377, 21 N. E. 2d 308, modified the decree, by enjoining peaceful picketing as well as acts of violence. This was affirmed by the Supreme Court of the United States, on the theory that acts of picketing in themselves peaceful could be enjoined when they were enmeshed with contemporaneously violent conduct which is concededly outlawed. The ratio decidendi of the case is indicated by the following quotation from the prevailing opinion written by Mr. Justice Frankfurter [312 U. S. 287, 61 S. Ct. 555]:

"It must never be forgotten, however, that the Bill of Rights was the child of the Enlightenment. Back of the guarantee of free speech lay faith in the power of an appeal to reason by all the peaceful means for gaining access to the mind. It was in order to avert force and explosions due to restrictions upon rational modes of communication that the guarantee of free speech was given a generous scope. But utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution."

In *A. F. L.* v. *Swing*, 312 U. S. 321, 61 S. Ct. 568, 570, 85 L. Ed. 855, the court upheld the right of a union and its members peacefully to picket a barber shop, although none of the pickets were employees at the shop. Said the court:

"A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him."

In *Carpenter & Joiners Union* v. *Ritter's Cafe*, 315 U. S. 722, 62 S. Ct. 807, 809, 86 L. Ed. 1143, the court, speaking through Mr. Justice Frankfurter said:

"The constitutional right to communicate peaceably to the public the facts of a legitimate dispute is not lost merely because a labor dispute is involved, * * * or because the communication * * * does not concern a dispute between an employer and those directly employed by him. * * *"
"It is true that by peaceful picketing workingmen communicate their grievances. As a means of communicating the facts of a labor dispute peaceful picketing may be a phase of the constitutional right of free utterance."

In *Bakery & Pastry Drivers Local* v. *Wohl*, 315 U. S. 769, 62 S. Ct. 816, 86 L. Ed. 1178, the members of a labor union of drivers engaged in the distribution of baked goods, in an endeavor to induce peddlers to work but six days per week and to hire an unemployed union member one day per week, peacefully picketed bakeries from which the peddlers obtained their goods, and places of business of the peddlers' customers, carrying placards with the ped-

dlers' names and a true statement of the union grievances. A state court injunction against such picketing was held to be an unconstitutional invasion of the right of free speech.

In recent years many of the states have sought to place restraints upon the activities of labor unions by the enactment of appropriate legislation. Many of these state statutes have already found their way into the highest appellate courts of the states for construction and review. The nature and extent of the restraints sought to be imposed has varied considerably from state to state.

Various state enactments have been before the courts in the following cases: *Stapleton* v. *Mitchell*, D. C., 60 F. Supp. 51 (construing Kansas statute); *Hotel & Restaurant Employees' International Alliance* v. *Wisconsin Employment Relations Board*, 236 Wis. 329, 294 N. W. 632, on petition for rehearing, 295 N. W. 634, affirmed by United States Supreme Court in 315 U. S. 437, 62 S. Ct. 706, 86 L. Ed. 946; *City of Reno* v. *Second Judicial Court*, 59 Nev. 416, 95 P. 2d 994, 125 A. L. R. 948 (city ordinance); *AFL* v. *Bain*, 165 Or. 183, 106 P. 2d 544, 130 A. L. R. 1278; *AFL* v. *Reiley*, 113 Colo. 90, 155 P. 2d 145, 160 A. L. R. 873; *People* v. *Garcia*, 37 Cal. App. Supp. 2d 753, 98 P. 2d 265 (city ordinance); *People* v. *Gidaly*, 35 Cal. App. Supp. 2d 758, 93 P. 2d 660, (city ordinance); *People* v. *Harris*, 104 Colo. 386, 91 P. 2d 989, 122 A. L. R. 1034; *Ex parte Blaney*, 30 Cal. 2d 643, 184 P. 2d 892; and *Alabama State Federation of Labor* v. *McAdory*, 246 Ala. 1, 18 So. 2d 810.

In *AFL* v. *Bain*, 165 Or. 183, 106 P. 2d 544, 130 A. L. R. 1278, the Supreme Court of Oregon held unconstitutional a statute which made it unlawful to picket the premises of an employer unless there was an actual bona fide existing labor dispute between such employer and his employees. The statute defined labor dispute to mean an actual bona fide controversy in which the disputants stood in the proximate relation of employer and the majority of his or its employees and which concerned matters directly pertaining

to wages, hours, or working conditions of the employees of the particular employer involved in such controversy. The Oregon statute, though similar to the Utah statute, was more restrictive in that it made picketing outside the terms of the statute not merely an unfair labor practice, but unlawful. The Oregon statute also placed severe limitations on the purposes or objectives for which picketing could be carried on.

In *AFL* v. *Reiley*, 113 Colo. 90, 155 P. 2d 145, the Supreme Court of Colorado struck down that portion of the Colorado statute which provides as follows:

"No strike shall be lawful unless it is authorized by a majority vote of the employees in the union involved taken by secret ballot *such as is provided in this subdivision.*" (Italics added.) '35 C. S. A. Supp. c. 97, § 94(7).

In *People* v. *Gidaly*, 35 Cal. App. Supp. 2d 758, 93 P. 2d 660, the Superior Court of California struck down as unconstitutional, an ordinance which prohibited the picketing of a place of business where less than a majority of the bona fide employees were on strike.

In *Stapleton* v. *Mitchell*, D. C., 60 F. Supp. 51, a three judge federal district court declared unconstitutional a Kansas statute making it *unlawful* for any person to participate in any strike, walkout or cessation of work or continuation thereof without the same being authorized by a majority vote of the employees to be governed thereby, provided that this should not prohibit any person from terminating his employment on his own volition.

A similar statute of Alabama was struck down in *Alabama State Federation of Labor* v. *McAdory*, 246 Ala. 1, 18 So. 2d 810, 827. The court said:

"As we have previously noted, each individual employee has a right to strike for a legally justifiable purpose, and such a right, of course, rests upon a minority as well as upon a majority."

The case most strongly relied upon by the company to sustain the order of the board is *Hotel & Restaurant Employees' International Alliance* v. *Wisconsin Employment Relations Board,* 1940, 236 Wis. 239, 294 N. W. 632, on rehearing, 295 N. W. 634, affirmed in 315 U. S. 437, 62 S. Ct. 706, 86 L. Ed. 946. The statute here under construction was borrowed almost verbatim from Sec. 111.06(2) (e) of the Wisconsin Stats., which provides:

"(2) It shall be an unfair labor practice for an employe individually or in concert with others:
       *     *     *     *     *

"(e) To cooperate in engaging in, promoting or inducing picketing, [(not constituting an exercise of constitutionally guaranteed free speech)] boycotting or any other overt concomitant of a strike unless a majority in a collective bargaining unit of the employes of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike."

The only difference in the two statutes is that the Wisconsin statute does not contain the parenthetical expression enclosed in brackets in the above quotation. However, the Wisconsin statute contains a separate section which provides that nothing

"in this chapter [shall] be so construed as to invade unlawfully the right to freedom of speech." Section 111.15.

The Wisconsin court sustained the validity of the act, but did so on the theory that the statute was directed only at violent picketing. Said the court [236 Wis. 239, 294 N. W. 639]:

"Chapter 111 is a statute of that character. We do not understand the decisions of the United States Supreme Court to mean that there can be no regulation of the right of picketing. That Court has not yet said that a person who goes upon the premises of another for the purpose of creating a disturbance and disorganizing the other's business, is protected in the doing of such acts by the constitutional guaranty of free speech. *In this case it is undisputed that numerous assaults were committed by pickets, that the pickets acted in concert; that the fines of these pickets were paid by the unions; that ingress and egress to and from the premises of the employer were prevented*

*by force and arms. It was at conduct of that kind that the statute was aimed. It is conduct of that kind that is dealt with in this case. It is conduct of that kind that is declared to be an unfair labor practice by the statute* and from which the defendants are ordered to cease and desist. * * *

"As already pointed out the Wisconsin statute expressly provides that it shall be so construed and applied that it shall not interfere with the right of free speech. As we understand and construe the statute the right of free speech is not interfered with. *The conduct complained of in this case and described as 'picketing' was not the sort of conduct that was indulged in by the defendant in the Thornhill case. The conduct complained of in this case and dealt with by the board and by the court was of an entirely different character. It was mass picketing, organized and carried on by the unions supplemented by boycott and violence and was clearly within the exception stated in the Thornhill case warranting state action.* In that case, the Supreme Court of the United States said: 'We are not now concerned with picketing en masse or otherwise conducted which might occasion such imminent and aggravated danger to these interests as to justify a statute narrowly drawn to cover the precise situation giving rise to the danger.' * * *

"The act does not limit the right of an employee to speak freely. It declares cooperating 'engaging in, promoting or inducing picketing, boycotting,' etc., in aid of an unauthorized strike, to be an unfair labor practice. The fact that an employee in the course of doing the designated acts may use speech as a means of carrying on his activities, does not bring the acts within the protection of the constitutional guaranties of free speech. *The term 'picketing' as used in subsec. 2(e) of § 111.06 does not include acts held in the Thornhill case to be within the protection of the constitutional guaranty of the right of free speech. The express language of the act forbids such a construction. It clearly refers to that kind of picketing which the Thornhill case, 310 U. S. 88, 60 S. Ct. 745, 84 L. Ed. 1093, says the state has power to deal with as a part of its power 'to preserve the peace and protect the privacy, the lives, and the property of its residents.'"* (Italics ours.)

The views thus expressed were even more strongly reaffirmed in the opinion on petiton for rehearing; and the affirmance of the United States Supreme Court was quite clearly based on the construction placed upon the Wisconsin Act by the Wisconsin Supreme Court.

In the opinion of the Supreme Court of the United States on certiorari to review the affirmance by the Supreme Court of Wisconsin of a decree of the lower court sustaining an order of the Employment Relations Board of Wisconsin, Mr. Justice Frankfurter stated [315 U. S. 437, 62 S. Ct. 708],

"Whether Wisconsin has denied the petitioners any rights under the federal Constitution is our ultimate responsibility. But precisely what restraints Wisconsin has imposed upon the petitioner [Hotel and Restaurant Employees International Alliance, Local No. 122, et al.] is for the Wisconsin Supreme Court to determine,"

and again,

"Problems that would arise had the order and the pertinent provisions of the Act been otherwise construed by the Supreme Court of Wisconsin need not therefore be considered."

The cases in the Supreme Court of the United States in regard to the relation of picketing to free speech under varying situations, if not in unstable equilibrium, are not completely stabilized, and necessarily so because in this field of the law, labor's right on the one hand to communicate information or pursuade through picket line technique, and on the other hand the rights of the employer or of the public are in delicate balance, if not in opposition. The law may be pronounced only according to to various factual situations as they are presented on review. If we were to hold that peaceful picketing cannot be made conditional on the taking of a strike vote because it is a form of constitutionally guaranteed free speech, and that this subsection (2) (c) is directed toward all types of picketing, we would unnecessarily be making a ruling broader than is here required.

It is not necessary for us to determine whether we think Section 111.06 (2) (e) of the Wisconsin Act was properly construed by the Wisconsin Supreme Court when it held that it was directed only against the type of picketing found in the *Thornhill* case [310 U. S. 88, 60 S. Ct. 745], supra, to be such as the state had power to deal with as a part of its powers "to preserve the peace and to protect the privacy,

the lives and the property of its residents," as distinguished from the construction found by Utah Labor Relations Board that it was directed against all picketing in cases where a secret strike vote had not been taken prior to calling a strike.

All we need do in this case is to hold that peaceful picketing under the circumstances of this case and as here carried on was permitted under the very exception contained between the parenthesis of section (2) (c) because it is an exercise of constitutionally guaranteed free speech."

The only acts in the record which could be characterized as picketing are: The parking of a car on the roadway near the company's road construction camp which road was being constructed through a mountainous area. There was placed on the car a banner or placard with the word "picket" printed thereon. Several men were congregated around the car. The men would hail approaching motorists and notify them that there would be no work because there was a labor dispute. As stated elsewhere in this opinion, there was no blocking of traffic nor any substantial obstruction to the entrance to the place of employment. There was no picketing en masse nor any evidence of violence, intimidation, coercion, disorder, unlawfulness or any acts tending to cause any disturbance or breach of the peace, save for such mental reactions laboring men generally have regarding a picket line and their tendency to respect it. Save for those forms of psychological coercion, the notice of a strike might as well have been posted on the mountainside out of the immediate presence of any of the striking workmen. Neither the objects sought to be accomplished by the union nor the means used to achieve the objective were made unlawful. Unless it was the intent of the legislature to declare any kind of picketing an unfair labor practice regardless of the objectives sought to be achieved or the means to achieve them, Section (2) (c) is constitutional because by its owns words it exempts constitutionally guaran-

teed free speech, and such picketing as we have in this case is a means of speaking freely. We think picketing as carried on here for the objective sought is free speech protected by the Federal Constitution.

It is contended that if the legislature did not intend to make all forms of picketing regardless of means or objectives unfair labor practices unless a secret ballot on a strike vote were taken, there would be no purpose for subsections (2) (d), (2) (e) of Sec. 49-1-16, U. C. A., as amended. We are not inclined to search our minds to ascertain whether there are not some types of picketing and some objectives sought by them not condemned by other paragraphs of subsection (2) of the statute which could be restrained under subsection (2) (c). We are not prepared at this time to hold that there may not be some forms of peaceful picketing or some circumstances under which or some objectives for which such picketing might be conducted which would take it out of the protection of the clause in the parentheses of 2 (c). But the instant case does not present such a case.

It is a familiar principle of statutory construction that where a statute has received a judicial construction by the courts of the state where originally enacted and is afterwards adopted by another state it will be presumed to have been enacted with that construction placed ■ upon it. *Fuller-Toponce Truck Co.* v *Public Service Commission,* 99 Utah 28, 96 P. 2d 722. However, this court is not absolutely bound by such construction, and if deemed clearly wrong, such construction will not be followed. *In re Reynolds' Estate,* 90 Utah 415, 62 P. 2d 270.

Implicit in the decision of the Wisconsin Supreme Court in the *Hotel and Restaurant Employees'* case is the holding that had the picketing in that case been peaceful, Wisconsin's 111.06 (2) (e) would not have been applicable because Wisconsin's Employment Peace Act itself provided that it should not be construed so as to impair the right of free speech.

Section 111.15 of the Wisconsin Act reading, as far as material here, as follows:

"* * * nor shall anything in this sub-chapter be so construed as to invade unlawfully the right to freedom of speech."

We are not founding the holding in this case on said implication even though the Wisconsin case was decided before our Section (2) (c) was passed by the legislature. While such implication gives additional strength to our conclusions in this case, we prefer to come to our conclusions in the manner that we have, to wit, by holding that the type of picketing as shown by the evidence recited above is a means of expression and as such constitutes an exercise of constitutionally guaranteed free speech.

It follows that the order of the board must be set aside. So ordered.

PRATT, C. J., and WADE, LATIMER, and Mc-DONOUGH, JJ., concur.