# STATE v. MONTGOMERY WARD & CO., Inc.

No. 7492.   Decided June 19, 1951.   (233 P. 2d 685.)

Certiorari Denied by U. S. Supreme Court November 13, 1951.

See 56 C. J. S., Master and Servant, sec. 154.  Checkoff system, 31 Am. Jur., Labor, sec. 5.

*Clinton D. Vernon,* Atty. Gen., *Mark K. Boyle,* Asst. Atty. Gen., *Brigham E. Roberts,* Dist. Atty., *Clarence M. Beck, Reid W. Nielsen,* Salt Lake City, for appellant.

*George A. Critchlow,* Salt Lake City, *Thomas L. Cochran,* Oakland, Cal., of counsel, for respondent.

WOLFE, Chief Justice.

One Walter Knorr executed and delivered the following written assignment of a portion of his wages to his employer, Montgomery Ward & Co., the respondent:

"Authorization and Assignment for Check Off

"I, the undersigned member of Local Union No. 222 International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. of L., do hereby authorize and direct my employer Montgomery Ward and Company to deduct from my wages each month the sum of $4.00 as membership dues, which includes initiation fees, fines and assessments, due said union pursuant to my membership therein, providing such deductions does [sic] not exceed 3% of my monthly wages, and to pay the sum to the Secretary of said Union or such part thereof as may be determined by him and at such times as he may request, to whom I hereby assign the same, and I hereby direct and authorize my said employer to make such deductions and so pay the same until I otherwise direct through an instrument in writing.

Dated at Salt Lake City, Utah, this 19 day of Sept. 1949.

"/s/ Walter Knorr"

The respondent refused to honor the assignment and a criminal complaint was filed against it charging the violation of Sections 49-14-1 and 3, Utah Code Annotated 1943, which provide respectively as follows:

"Whenever an employee of any person, firm, school district, private or municipal corporation within the state of Utah executes and delivers to his employer an instrument in writing whereby such employer is directed to deduct a sum at the rate not exceeding three per cent per month, from his wages and to pay the same to a labor organization or union or any other organization of employees as assignee, it shall be the duty of such employer to make such deduction and to pay the same monthly or as designated by employee to such assignee and to continue to do so until otherwise directed by the employee through an instrument in writing."

"Any employer * * * who wilfully fails to comply with the duty here imposed shall be guilty of a misdemeanor."

After being bound over to the district court by a committing magistrate, an information was filed in that court charging the respondent with the willful violation of the above sections. At the arraignment, the respondent moved to quash the information and after taking the matter under advisement, the district court granted the motion to quash. The State prosecutes this appeal from a judgment dismissing the action.

It was stipulated by the parties that the respondent was an employer and that Walter Knorr was an employee in "industry affecting commerce" as that term is used in the Labor Management Relations Act, 1947, colloquially known as the Taft-Hartley Act, 61 Stat. 136, c. 120, 29 U. S. C. A. § 141 et seq., hereinafter referred to as the L. M. R. A., and that both the respondent and Knorr are subject to the provision of that act. The question which divides the parties, and which is the sole question for our determination, is whether the above-mentioned Utah statute is repugnant to section 302 of the L. M. R. A. The appellant contends that Congress in the L. M. R. A. did not preempt the field of legislation on the subject of the "check-off"[1], but left to the States an area within which they may legislate in regard to that subject, and asserts that secs. 49-14-1 and 3, U. C. A. 1943, do not conflict with sec. 302 but complement it. Sec. 302 of the L. M. R. A. so far as applicable here provides:

"(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.

"(b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value.

---

[1] A device whereby union dues and other obligations of employees to their union are deducted from the employees' wages by the employer, either with or without specific authorization from the employees, and transmitted by the employer directly to the union.

"(c) The provision of this section shall not be applicable (1) * * *; (2) * * *; (3) * * *; (4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided,* That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner; or (5) * * *.

"(d) Any person who wilfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both."

Neither party has cited any judicial decisions determining what effect, if any, section 302 of the L. M. R. A. has upon state statutes regulating or controlling the "check-off." In support of its position, however, the appellant refers us to the case of *Algoma Plywood & Veneer Co.* v. *Wisconsin Employment Relations Board,* 336 U. S. 301, 69 S. Ct. 584, 589, 93 L. Ed. 691, in which, it is claimed the Supreme Court of the United States determined an analogous question. In that case, the Company, a manufacturer of products sold chiefly in interstate commerce, had agreed to a "maintenance-of-membership" clause in a contract with a union. That clause provided that all employees, who on the date of the signing of the agreement were members of the union, should, during the life of the agreement, as a condition of employment, remain members of the union in good standing. When one Victor Moreau willfully refused to pay his union dues, he was discharged by the Company. Moreau thereupon filed a complaint with the Wisconsin Employment Relations Board charging the Company with an unfair labor practice under Wis. Stat. sec. 111.06 providing that:

"(1) It shall be an unfair labor practice for an employer * * * (c) 1. To encourage * * * membership in any labor organization * * * by discrimination in regard to hiring, tenure or other terms

or conditions of employment; provided, that an employer shall not be prohibited from entering into an all-union agreement with the representatives of his employes in a collective bargaining unit, where at least two-thirds of such employes voting * ·* * shall have voted affirmatively by secret ballot in favor of such all-union agreement in a referendum conducted by the board. * * *"

Because no referendum had been conducted at the Company plant, the Board ordered the Company to cease and desist from giving effect to the "maintenance-of-membership" clause in the agreement, to offer Moreau reinstatement, and to make him whole for loss of pay.

Upon certiorari to the Supreme Court of the United States, the Company and the union joined in contesting the jurisdiction of the Wisconsin Employment Relations Board on the ground that by section 10 (a) of the National Labor Relations Act, 49 Stat. 449, 453, c. 372, 29 U. S. C. A. § 160 (a) (hereafter in this opinion designated as the N. L. R. A.), Congress had vested in the National Labor Relations Board the exclusive power to prevent unfair labor practices affecting interstate commerce. Sec. 10 (a) of the N. L. R. A. provides that:

"The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce. This power shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or many be established by agreement, code, law, or otherwise."

The Supreme Court held that section 10 (a) specifically limited the exclusive power of the National Labor Relations Board to prevent unfair labor practices to those practices listed in section 8 of the N. L. R. A. and did not preclude the States from preventing other practices which they deemed unfair not listed in sec. 8, such as that enjoined by Wis. Stat. sec. 111.06 (1) (c) 1, quoted above.

It was further contended by the Company and the union that the aforementioned Wisconsin statute was repugnant to section 8 (3) of the N. L. R. A., 49 Stat. 452, c. 372,

29 U. S. C. A. § 158(3), providing that it shall be an unfair labor practice for an employer:

"By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act * * * or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization * * * to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made."

The court held that there was no repugnancy because section 8(3) did not authorize the making of closed shop or other union security agreements including maintenance-of-membership agreements, nor did it attempt to make them legal in states where they were illegal, but that section 8(3) was merely a declaration by Congress that nothing in any federal law should be held to illegalize union security agreements voluntarily entered into between employers and workers. Said the court:

"It is argued, therefore, that a State cannot forbid what § 8(3) affirmatively permits. The short answer is that § 8(3) merely disclaims a national policy hostile to the closed shop or other forms of union-security agreement. This is the obvious inference to be drawn from the choice of the words 'nothing in this Act * * * or in any other statute of the United States,' and it is confirmed by the legislative history."

The Supreme Court then considered whether the L. M. R. A. expressed a policy inconsistent with Wis. Stat. sec. 111.06 (1) (c) 1, but concluded that it did not but that the L. M. R. A. left the States

"free to pursue their own more restrictive policies in the matter of union-security agreements."

Because section 8(3) of the L. M. R. A. forbids the closed shop and regulates the making of union shop contracts, Congress, in order to forestall the inference that

the L. M. R. A. legalized union shop agreements in states where they were banned by state law, enacted section 14 (b) providing that:

"Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

Instead of supporting the appellant's contention that Congress has left open to the States an area within which they may legislate in regard to the "check-off," the *Algoma* case in fact supports an opposite conclusion. Unlike section 8(3) of the N. L. R. A. which, as it has been seen, is merely a disclaimer by Congress of a national policy hostile to union shop and other union security agreements, and is neither an authorization nor a prohibition of such agreements, section 302(a) and (b) of the L. M. R. A. is a general prohibition against the payment to or receipt by any employee representative of any money or other thing of value where the payment is made by an employer. For violation of the prohibition, a fine or imprisonment, or both, may be imposed. However, out of this general prohibition section 302(c) carves five exceptions in which the payment to and receipt by an employee representative of money by an employer is not banned. One of these exceptions permits the "check-off" of membership dues provided the employer has received a written assignment from each employee from whose wages dues are to be deducted and provided that such assignments are not irrevocable for a period longer than one year or beyond the termination date of the applicable collective agreement, whichever occurs sooner. The attaching of these two conditions to the "check-off" of membership dues demonstrates clearly that Congress was not indifferent to that subject, but on the contrary, was so vitally interested therein, that it established certain conditions precedent which an employer must meet before he may "check-off" membership

dues. By the general prohibition contained in section 302 (a) and (b), tempered only by the exceptions in sec. 302(c) and the conditions attached thereto, Congress has effectively preempted the entire field of legislation in regard to the "check-off" and thus has precluded the States from legislating on that subject.

In sharp contrast to the policy of Congress to occupy the whole field of legislation on the subject of the "check-off," as expressed in sec. 302 of the L. M. R. A., is the intent of that body, as expressed in both the N. L. R. A. and the L. M. R. A., to leave open to the States an area within which they may legislate in regard to union security agreements. As was pointed out in the *Algoma* case, neither in the N. L. R. A. nor in the L. M. R. A., except for the closed shop, does Congress either prohibit or authorize the execution of union security agreements, but leaves the States free to control or prohibit, if they choose, the making of such agreements. To make it explicit that Congress was not attempting by the L. M. R. A. to preempt the field of legislation in regard to union security agreements, section 14(b), quoted above, was included in the Act. Had Congress in the L. M. R. A. meant to leave the States free to further legislate in regard to the "check-off," certainly it would have made that intent manifest as it did with respect to union-security agreements.

There is no merit to the appellant's contention that sections 49-14-1 and 3, U. C. A. 1943, complement, but do not conflict with, sec. 302 of the L. M. R. A. Sec. 302(c) *permits* an employer to "check-off" membership dues from the wages of those employees who have delivered to him an assignment executed in accordance with the provisions of that section. There is nothing in that section compelling an employer to "check-off" dues; he has the option to "check-off" dues or to refuse to do so, absent an agreement requiring it. However, secs. 49-14-1 and 3, U. C. A. 1943, destroy that option by making the refusal of an employer to honor an assignment a misdeameanor. The

Utah statutes further conflict with sec. 302 of the L. M. R. A. by compelling employers to recognize assignments which may be made irrevocable for a period longer than one year and which may be made for the payment of obligations other than "membership dues." Sec. 49-14-1, U. C. A. 1943, contains no limitation as to the period of time for which an assignment may be made irrevocable nor any restriction whatever as to the purpose for which amounts may be checked-off. It is no answer to these objections to argue, as does the dissenting opinion, that the particular assignment in question executed by Walter Knorr was irrevocable at any time and that from Knorr's receipt book it appears that no amounts had been checked-off from his wages in payment of fines or obligations other than dues. We are in this case determining whether sec. 302 of the L. M. R. A. conflicts with the Utah statute aforementioned —not simply whether the particular assignment in question as it has been executed conflicts with the federal act. It is immaterial whether the assignment does not conflict because the employer was not in fact required to make a check-off of fines and assessments because there were no fines imposed nor assessments assessed although the assignment required that the employer check those off if they had been owing to the union.

When Congress has by a sweeping prohibition banned the payment to or receipt by an employee representative of any money or thing of value where the payment is made by an employer, subject only to certain specific exceptions, there is no room for the States to narrow or enlarge upon the exceptions without conflicting with the policy of Congress. It is difficult to conceive how Congress could have more fully occupied the field of legislation in regard to the "check-off" than it has done in sec. 302 of the L. M. R. A.

Thus it follows that secs. 49-14-1 and 3, U. C. A. 1943, being repugnant to sec. 302 of the L. M. R. A. must yield to the latter and be held not applicable to employers and

employees in any "industry affecting commerce" as defined in the L. M. R. A.

The judgment of the district court dismissing the action against the respondent is affirmed.

McDONOUGH and CROCKETT, JJ., concur.

LATIMER, Justice.

I dissent.

I first dispose of a procedural matter which appears to be fatal to respondent's cause. My reading of the record causes me to conclude that the parties in this action did not bring into issue the specific provisions of the assignment. The matter must have been presented in the court below on the broader theory that, irrespective of the terms of the assignment, the National Labor Management Relations Act had occupied the so-called "check-off" field and hence the employer was not required to honor any assignment. I arrive at this conclusion because I cannot find where the authorization and assignment for checkoff quoted in the opinion of Chief Justice Wolfe was made a part of the files and records in the district court. They were admitted in evidence in the preliminary hearing in the city court, but the matter came on for plea in the district court and a motion to quash the information was filed. It was not fortified by an affidavit and no facts were alleged in the motion. I find no stipulation in the record that the exhibits introduced in the city court could be considered in connection with the motion to quash, and, likewise, I find nothing in the record showing the exhibits were admitted in evidence in support of the motion in the district court. No evidence has been certified to this court and so it is my belief that we must determine the merits of the motion on the pleadings. If we were to do this, then the issues would be simplified. However, in view of the importance of putting at rest the questions involved, I shall express my views on whether the provisions of the assignment render it

unenforceable under the Labor-Management Relations Act, 1947, which I shall hereinafter refer to as the Taft-Hartley Act. The National Labor Relations Act, 1935, will be designated as the Wagner Act.

To arrive at the correct solutions of the problems presented by this appeal is not without difficulty. The Supreme Court of the United States in dealing with conflicts between the State and Federal statutes has encountered no end of trouble in carving out a well-defined legal path for other courts to follow. The most satisfactory method for me to use in attempting to follow the reasoning of that court and in trying to isolate the guideposts erected by it is a case-by-case analysis. Even this method is fraught with uncertainty on my part as some of the decisions seem to be irreconcilable although the principles are rather well defined. What Mr. Justice Wolfe said in *International Union, etc.,* v. *Utah Labor Relations Board,* 115 Utah 183, 203 P. 2d 404, about the law with respect to picketing is apropos to the principles here involved. I quote from page 413 of 203 P. 2d:

"The cases in the Supreme Court of the United States in regard to the relation of picketing to free speech under varying situations, if not in unstable equilibrium, are not completely stabilized, and necessarily so because in this field of the law, labor's right on the one hand to communicate information or persuade through picket line technique, and on the other hand the rights of the employer or of the public are in delicate balance, if not in opposition. The law may be pronounced only according to various factual situations as they are presented on review. * * *"

The unstable equilibrium in the conflicts-of-law cases stems not from the principles enunciated by that court but from the attempts of the justices to fit the facts of the particular case to those principles. This presents the real problem in the present litigation.

The Wagner Act was passed in 1935. Many of the states sought to pattern their legislation to fit the structure created by that act and I have little doubt but that our statute

in question was enacted to carry out the then prevalent concept that power of the working classes was in imbalance with the powers exerted by employers, and that state aid was necessary to help bring about a balanced labor-management relationship. To this end, our Legislature in 1937 passed Chapter 57, which is headed, "Assignments for Benefit of Labor and Farm Organizations." The act, insofar as relevant, is as follows:

"Whenever an employee of any person, firm, school district, private or municipal corporation within the state of Utah executes and delivers to his employer an instrument in writing whereby such employer is directed to deduct a sum at the rate not exceeding three per cent per month, from his wages and to pay the same to a labor organization or union or any other organization of employees as assignee, it shall be the duty of such employer to make such deduction and to pay the same monthly or as designated by employee to such assignee and to continue to do so until otherwise directed by the employee through an instrument in writing."

The constitutionality of this act has not been previously questioned and is only assailed in this proceeding insofar as it is claimed to be in conflict with the Taft-Hartley Act. I, therefore, presume that unless the latter act collides with the above quoted chapter the former is invulnerable to attack.

In 1947, Congress passed the Taft-Hartley Act, and, while the applicable section is quoted in Mr. Chief Justice Wolfe's opinion, I re-quote it with my emphasis added:

"(a) *It shall be unlawful for any employer to pay* or deliver, or agree to pay or deliver, *any money* or other thing of value *to any representative of any of his employees who are employed in an industry affecting commerce.*

          \*        \*        \*        \*        \*

"(c) The provisions of this section shall not be applicable (1) \* \* \* (2) \* \* \* (3) \* \* \* (4) *with respect to money deducted* from the wages of employees *in payment of membership dues in a labor organization: Provided, That the employer has received from each employee,* on whose account such deductions are made, *a written assignment which shall not be irrevocable for a period*

*of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner;* * * *.*" (Emphasis added.)

The present difficulty arises because defendant refused to honor an assignment made by a union member. Its refusal to honor the assignment was based upon the claim that it could not comply with the requirements of the State law without being subject to prosecution for violation of the Taft-Hartley Act. No right-thinking person would compel a company to act in defiance of a Federal statute and thus subject itself to censure or prosecution. On the other hand, labor-management relations are so closely interwoven with Federal control and local regulations that refined distinctions must be made or a State would yield its sovereignty over matters which are of purely local concern. It may be difficult for an employer to distinguish when a Federal act which is paramount, insulates him from the requirements of a State statute, but this is a situation which every employer must face if two sovereignties are to legislate on the same relationship. Even though a burden is placed on the employer, State courts cannot cast aside legislative pronouncements to make the decision less difficult.

Mr. Justice Frankfurter's dissenting opinion in the case of *Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, etc.,* v. *Wisconsin Employment Relations Board,* 1951, 340 U. S. 383, 71 S. Ct. 359, is my authority for the statement that on eight occasions the United States Supreme Court has considered whether the Taft-Hartley Act or its predecessor, the Wagner Act, so collided with a State law as to displace it. At the expense of brevity, I desire to mention and quote from these cases. I shall treat with them in chronological order.

In the case of *Allen-Bradley Local No. 1111* v. *Wisconsin Employment Relations Board,* 315 U. S. 740, 62 S. Ct. 820, 824, 86 L. Ed. 1154, the question presented was whether an order of the Wisconsin Employment Relations Board

entered under the Wisconsin act was unconstitutional and void as being repugnant to the provisions of the Wagner Act. The Wisconsin statute under attack provided, in part, that it should be an unfair labor practice for employees to hinder or prevent by mass picketing, threats or coercion, the pursuit of any lawful work or employment, or to obstruct or interfere with entrance to or egress from any place of employment. After a hearing, the state board found that the union and its members violated the provisions of that act by threatening employees, obstructing and interefering with entrances to and egress from the factory, and the picketing of homes of employees. An injunction was issued ordering the union and its members from continuing those acts. The Supreme Court of Wisconsin upheld the order of the Board on the theory that there could be no conflict between the statutes until they were applied to the same labor dispute. The United States Supreme Court affirmed the holding of the Wisconsin Supreme Court and in its opinion stated the contentions of the respective parties in the following language:

"Various views have been advanced here. On the one hand, it is urged that in this situation, as in the case of federal control over intrastate transportation rates (Shreveport Case (*Houston, E. & W. T. R. Co.* v. *United States*), 234 U. S. 342, 357, 34 S. Ct. 833, 838, 58 L. Ed. 1341; *Board [of Railroad Com'rs of State of North Dakota]* v. *Great Northern Ry Co.*, 281 U. S. 412, 424, 426-428, 50 S. Ct. 391, 394, 395, 396, 74 L. Ed. 396 [936]), state action should not be foreclosed in absence of a finding by the federal Board under § 10(a), 29 U. S. C. A., § 160(a), that an employer's labor practice so affects interstate commerce (*National Labor Relations Board* v. *Fainblatt*, 306 U. S. 601, 59 S. Ct. 668, [307 U. S. 609], 83 L. Ed. 1014) that it should be prevented. On the other hand, it is earnestly contended that the state Act viewed as a whole so undermines rights protected and granted by the federal Act and is so hostile to the policy of the federal Act that it should not ·be allowed to survive. Acceptance of the latter theory would necessitate a reversal of the judgment below. Acceptance of the former would mean that in all cases orders of the state Board would be upheld if the federal Board had not assumed jurisdiction."

That court announced the principle that in dealing with this type of case it did not deal with theoretical disputes but with concrete and specific issues raised by actual cases and that constitutional questions are not to be dealt with abstractly. The opinion confines itself to a discussion of the facts of that case and disavows any intention of dealing with other types of orders in cases where the federal board had not assumed jurisdiction. The following quotations seem to state the general rule with respect to conflict between state and federal legislation.

"We agree with the statement of the United States as amicus curiae that the federal Act was not designed to preclude a State from enacting legislation limited to the prohibition or regulation of this type of employee or union activity. The Committee Reports on the federal Act plainly indicate that it is not 'a mere police court measure' and that authority of the several States may be exerted to control such conduct. Furthermore, this court has long insisted that an 'intention of Congress to exclude states from exerting their police power must be clearly manifested'.

\* \* \* \* \*

"Since the state system of regulation, as construed and applied, here can be reconciled with the federal Act and since the two as focused in this case can consistently stand together, the order of the state Board must be sustained under the rule which has long obtained in this Court. See *Sinnot* v. *Davenport*, 22 How. 227, 243, 16 L. Ed. 243."

In *Hill* v. *State of Florida ex rel. Watson*, 325 U. S. 538, 65 S. Ct. 1373, 89 L. Ed. 1782, the Supreme Court of the United States reversed an order enjoining a union and its agent from operating in Florida until they had complied with a state statute. In that case, the State of Florida passed an act intended to regulate and control union activities by requiring that union business agents be licensed. A board composed of the Governor, Secretary of State, and the Superintendent of Education, was authorized to pass on applications and if they believed the applicant measured up to the standards of the act they were authorized to issue him a license. Until and unless approved by

the board and licensed, the agent was prohibited from functioning as an agent for the union. The question posed by the appeal was whether or not the Florida provisions herein mentioned collided with the "full freedom" of employees in selecting a bargaining agent as provided for in the Wagner Act. Mr. Justice Black wrote the majority opinion and Mr. Justice Frankfurter wrote a dissenting opinion. I quote from each:

"The only question we find it necessary to decide in this case is whether a Florida statute regulating labor union activities has been applied to these petitioners in a manner which brings it into irreconcilable conflict with the collective bargaining regulations of the National Labor Relations Act, 49 Stat. 449, 29 U. S. C. A. § 151 et seq. That Federal Act, we decided in *Allen-Bradley Local No. 1111* v. *Wisconsin Employment Relations Board*, 315 U. S. 740, 62 S. Ct. 820, 826, 86 L. Ed. 1154, did not wholly foreclose state power to regulate labor union activities. * * *

* * * * *

"Thus, the 'full freedom' of employees in collective bargaining which Congress envisioned as essential to protect the free flow of commerce among the states would be, by the Florida statute, shrunk to a greatly limited freedom. No elaboration seems required to demonstrate that Section 4 as applied here 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'

* * * * *

"Our holding is that the National Labor Relations Act and Sections 4 and 6 of the Florida Act as here applied cannot 'move freely within the orbit of their respective purposes without infringing upon one another.' *Union Brokerage Co.* v. *Jensen*, 322 U. S. 203, 207, 64 S. Ct. 967, 971, 88 L. Ed. 1227, 152 A. L. R. 1072. Accordingly the case is reversed and remanded for proceedings not inconsistent with this opinion."

Mr. Justice Frankfurter, in his dissenting opinon, stated as follows:

"* * * The States, in short, may speak on matters even in the general domain of commerce so long as Congress is silent. But when Congress has spoken, although not as fully as the Constitution authorizes, that is, when a federal enactment falls short of the Congressional power to legislate touching commerce, the States may still speak

where Congress is still silent. The real question is: Has Congress spoken so as to silence the States? The same regard for the harmonious balance of our federal system, whereby the States may protect local interests despite the dormant Commerce Clause, allows State legislation for the protection of local interests so long as Congress has not supplanted local regulation either by a regulation of its own or by an unmistakable indication that there is to be no regulation at all. The relation of such enactments of local concern to federal enactments which fall short of the full reach of the Constitution raises a problem of judicial judgment similar to that presented where a State law encounters no federal statute. The problem is one of judicial accommodation between respect for the supplanting authority of Congress and the reserved police power of the States. Long ago this policy of accommodation was formulated by this Court: 'We agree, that in the application of this principle of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together.' *Sinnot* v. *Davenport*, 22 How. 227, 243, 16 L. Ed. 243."

*Bethlehem Steel Co.* v. *New York States Labor Relations Board*, 330 U. S. 767, 67 S. Ct. 1026, 1030, 91 L. Ed. 1234, involved the conflict between the New York State Act and the National Labor Relations Act in regards to whether the state board or the National Labor Relations Board had jurisdiction to deal with the right to designate foremen's bargaining units. Mr. Justice Jackson delivered the opinion of the court, and the following quotations are taken from his decision:

"In the National Labor Relations Act, Congress has sought to reach some aspects of the employer-employee relation out of which such interferences arise. It has dealt with the subject or relationship but partially, and has left outside of the scope of its delegation other closely related matters. Where it leaves the employer-employee relation free of regulation in some aspects, it implies that in such matters federal policy is indifferent, and since it is indifferent to what the individual of his own volition may do we can only assume it to be equally indifferent to what he may do under the compulsion of the state. * * *

"* * * If the two boards attempt to exercise a concurrent jurisdiction to decide the appropriate unit of representation, action by

one necessarily denies the discretion of the other. The second to act either must follow the first, which would make its action useless and vain, or depart from it which would produce a mischievous conflict. The State argues for a rule that would enable it to act until the federal board had acted in the same case. But we do not think that a case by case test of federal supremacy is permissible here. The federal board has jurisdiction of the industry in which these particular employers are engaged and has asserted control of their labor relations in general. It asserts, and rightfully so, under our decision in the *Packard* case, supra [*Packard Motor Car Co.* v. *N. L. R. B.*, 330 U. S. 485, 67 S. Ct. 789, 91 L. Ed. 1040], its power to decide whether these foremen may constitute themselves a bargaining unit. We do not believe this leaves room for the operation of the state authority asserted."

*La Crosse Telephone Corporation* v. *Wisconsin Employment Relations Board,* 336 U. S. 18, 69 S. Ct. 379, 382, 93 L. Ed. 463, was an appeal from the Supreme Court of Wisconsin. In that case, the Wisconsin board certified that the employees in the plant and traffic departments of the telephone company had elected to combine in a single bargaining unit and had chosen a certain labor organization as their collective bargaining representative, and that the employees in the office department had elected to constitute themselves as a separate unit and had chosen not to have any representative. Under the Wisconsin act a majority of employees in a single craft, division, department, or plant of an employer could elect to constitute that group a separate bargaining unit. Under the Wagner Act, the National Labor Relations Board was authorized to decide in each case whether the appropriate unit should be an employee unit, craft unit, plant unit, or subdivision thereof. Mr. Justice Douglas delivered the opinion of the court in that case and struck down the Wisconsin Act because of a conflict with the Federal Act. In his opinion, he stated:

"* * * This employer is concededly engaged in interstate commerce; and the industry is one over which the National Board has consistently exercised jurisdiction. The Wisconsin Act provides that a majority of employees in a single craft, division, department or plant of an employer may elect to constitute that group a separate bargaining unit. § 111.02 (6). The federal act leaves that matter to

the discretion of the board. When under those circumstances the state board puts its imprimatur on a particular group as the collective bargaining agent of employees, it freezes into a pattern that which the federal act has left fluid. In practical effect the true measure of conflict between the state and federal scheme of regulation may not be found only in the collision between the formal orders that the two boards may issue. We know that administrative practice also disposes of cases in which no order has been entered. Disposition of controversies on an administrative as distinguished from a formal basis will often reflect the attitudes of the National Board which have not been reduced to orders in those specific cases. A certification by a state board under a different or conflicting theory of representation may therefore be as readily disruptive of the practice under the federal act as if the orders of the two boards made a head-on collision. These are the very real potentials of conflict which lead us to allow supremacy to the federal scheme even though it has not yet been applied in any formal way to this particular employer. The problem of employee representation is a sensitive and delicate one in industrial relations. The uncertainty as to which board is master and how long it will remain such can be as disruptive of peace between various industrial factions as actual competition between two boards for supremacy. We are satisfied with the wisdom of the policy underlying the Bethlehem case and adhere to it."

Another case which involved certiorari from the Supreme Court of Wisconsin to the Supreme Court of the United States was the case of *International Union, U. A. W., A. F. of L., Local 232* v. *Wisconsin Employment Relations Board*, 336 U. S. 245, 69 S. Ct. 516, 520, 93 L. Ed. 651. This involved a proceeding under state law in which the Wisconsin board ordered a labor union and members thereof to cease and desist from instigating certain intermittent and unannounced work stoppages. The facts were briefly these: The leaders of the International Union instituted a new method of putting pressure upon the employer. The stratagem consisted of calling special meetings of the union during working hours at any time the union saw fit, and employees would leave work to attend. The procedure was a new technique for bringing pressure upon the employer. The State Supreme Court upheld the Labor Board order and the Supreme Court of the United States granted certiorari. Mr. Justice Jackson wrote the opinion for the court

and the following quotations reflect the principles as announced by the majority members of the court:

"The substantial issue is whether Congress has protected the union conduct which the state has forbidden, and hence the state legislation must yield. When the order of the State Board and the decision of the State Supreme Court were made, the National Labor Relations Act, 49 Stat. 449, 29 U. S. C. §§ 151-166, 29 U. S. C. A. §§ 151-166, was in effect and questions of conflict between state and federal law were raised and decided with reference to it. However, the order imposes a continuing restraint which it is contended now conflicts with the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U. S. C. §§ 141-197, 29 U. S. C. A. §§ 141-197, which amended the earlier statute. We therefore consider the state action in relation to both Federal Acts.

\*  ,  \*  \*  \*  \*

"Congress made in the National Labor Relations Act no express delegation of power to the Board to permit or forbid this particular union conduct, from which an exclusion of state power could be implied. The Labor Management Relations Act declared it to be an unfair labor practice for a union to induce or engage in a strike or concerted refusal to work where an object thereof is any of certain enumerated ones. § 8(b) (4), 61 Stat. 140, 141, 29 U. S. C. § 158(b) (4) 29 U. S. C. A. § 158(b) (4). Nevertheless the conduct here described is not forbidden by this Act and no proceeding is authorized by which the Federal Board may deal with it in any manner. While the Federal Board is empowered to forbid a strike, when and because its purpose is one that the Federal Act made illegal, it has been given no power to forbid one because its method is illegal—even if the illegality were to consist of actual or threatened violence to persons or destruction of property. Policing of such conduct is left wholly to the states. In this case there was also evidence of considerable injury to property and intimidation of other employees by threats and no one questions the state's power to police coercion by those methods.

\*  \*  \*  \*  \*

"We think that this recurrent or intermittent unannounced stoppage of work to win unstated ends was neither forbidden by Federal statute nor was it legalized and approved thereby. Such being the case, the state police power was not superseded by congressional Act over a subject normally within its exclusive power and reachable by federal regulation only because of its effects on that interstate commerce which Congress may regulate. *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 57 S. Ct. 615, 81 L. Ed. 893; *Bethlehem Steel Co.* v. *New York State Labor Relations Board*, 330 U. S. 767, 67 S. Ct. 1026, 91 L. Ed. 1234."

Chief Justice Wolfe in his opinion deals with the *Algoma Plywood and Veneer Company* v. *Wisconsin Employment Relations Board,* 336 U. S. 301, 69 S. Ct. 584, 93 L. Ed. 691. In that case the National Labor Relations Board certified the union as bargaining representative for employees of a company producing goods for interstate commerce. Under pressure from the Department of Labor and the War Labor Board, the employer agreed to a maintenance-of-membership clause in its contract with the union. The Wisconsin statutes forbade enforcing a maintenance-of-membership clause unless the contract containing it was approved by two-thirds of the employees in a referendum conducted by the State Board. No referendum had been conducted for the employees of the petitioner and when it discharged an employee for refusing to pay union dues a complaint was filed with the Wisconsin Board. The National Labor Relations Board was empowered to prevent any person from engaging in any unfair labor practice affecting commerce. The power granted was to be exclusive and was not to be affected by any other means of adjustment or prevention that had been or might be established by agreement, law, or otherwise. Section (83) of the National Labor Relations Act provided as follows:

"By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act * * * or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization * * * to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made."

It was argued in that case that this section affirmatively permits a maintenance-of-membership arrangement and that a state could not forbid what that act permits. The opinion written by Mr. Justice Frankfurter goes to some length to show that by legislative interpretation Congress did not intend to prevent the states from legislating in the

field of "maintenance-of-membership" requirements. For this reason, the court was not impelled to invoke the rule quoted by him that

"in cases of concurrent power over commerce State law remains effective so long as Congress has not manifested an unambiguous purpose that it should be supplanted."

I quote what I believe to be an important paragraph of this opinion:

"We come now to the question whether the Taft-Hartley Act expresses a policy inconsistent with § 111.06 (1) (c) 1 of the Wisconsin Employment Peace Act.

"Section 10 (a) of the Taft-Hartley Act, which is set forth in the margin, contains important changes, but none requiring modification of the conclusions we have reached as to the corresponding section of the National Labor Relations Act. One phrase, however, reinforces those conclusions; that is the phrase 'inconsistent with the corresponding provision of this Act.' These words must mean that cession of jurisdiction is to take place only where State and federal laws have parallel provisions. Where the State and federal laws do not overlap, no cession is necessary because the State's jurisdiction is unimpaired. This reading is confirmed by the purpose of the proviso in which the phrase is contained: to meet situations made possible by *Bethlehem Steel Co.* v. *New York State Labor Relations Board*, 330 U. S. 767, 67 S. Ct. 1026, 91 L. Ed. 1234, where no State agency would be free to take jurisdiction of cases over which the National Board had declined jurisdiction. See H. R. Rep. No. 245, 80th Cong., 1st Sess. 40; S. Minority Rep. No. 105 [Views], P. 2, 80th Cong., 1st Sess. 38."

In the case of *International Union, etc.,* v. *O'Brien,* 339 U. S. 454, 70 S. Ct. 781, 783, 94 L. Ed. 978, the Supreme Court of the United States held that a Michigan statute could not survive because it conflicted with the exercise of federally protected labor rights. In that case, Michigan passed an act which provided that in the event the parties were unable to settle a labor dispute the employees or their representative in the case of impending strike, or the employer in case of an impending lockout, should serve notice upon the Board of such dispute not less than ten days be-

fore the strike or lock-out was to become effective. It further provided that the majority of all employees in such bargaining unit must vote in favor of a strike. Mr. Justice Vinson wrote the prevailing opinion, and stated:

"Even if some state legislation in this area could be sustained, the particular statute before us could not stand. For it conflicts with the federal Act. The Michigan law calls for a notice given 'In the event the parties * * * are unable to settle any dispute' to be followed by mediation, and if that is unsuccessful, by a strike vote within twenty days, with a majority required to authorize a strike. Under the federal legislation, the prescribed strike notice can be given sixty days before the contract termination or modification. § 8(d). The federal Act thus permits strikes at a different and usually earlier time than the Michigan law; and it does not require majority authorization for any strike. This requirement of approval by a majority of the employees was contained in the Bill which passed the House of Representatives; but the Act as finally adopted deliberately refrains from imposing the prerequisite of majority approval in each of its references to strike votes. §§ 203(c), 209(b)-210, 29 U. S. C. A. §§ 173(c), 179(b)-180.

"Finally, the bargaining unit established in accordance with federal law may be inconsistent with that required by state regulation. Though the unit for the Michigan strike vote cannot extend beyond the State's borders, the unit for which appellant union is the federally certified bargaining representative includes Chrysler plants in California and Indiana as well as Michigan. Chrysler Corp., 42 N. L. R. B. 1145 (1942). Without question, the Michigan provision conflicts with the exercise of federally protected labor rights. A state statute so at war with federal law cannot survive. * * *""

I do not make reference to facts involved in the case of *Plankinton Packing Co.* v. *Wisconsin Employment Relations Board,* 1950, 338 U. S. 953, 70 S. Ct. 249, which involved the question of whether a state could superimpose upon federal outlawries of conduct as an "unfair labor practice" its own finding of unfairness, for the reason that I find only a per curiam decision in which the Supreme Court of the United States merely refers to other decided cases.

The last cases which I quote from are *Amalgamated Association of Street, Electric Railway and Motor Coach*

*Employees, etc.,* v. *Wisconsin Employment Relations Board,* and *United Gas, Coke and Chemical Workers, etc.* v. *Wisconsin Employment Relations Board,* Nos. 329 and 438, decided in one opinion on February 26, 1951, 340 U. S. 383, 71 S. Ct. 359, 370. The appeals arose out of the State of Wisconsin enjoining a strike by public utility employees. The act involved vests in the State Circuit Courts jurisdiction to enjoin a work stoppage or slow-down which would cause an interruption of essential public services. The question posed was whether the Wisconsin act conflicted with the Taft-Hartley Act. The United States Supreme Court found that the state act collided with the federal legislation and it therefore held the former invalid. The opinion of the court shows by direct example how the two acts worked at cross purposes with each other. I quote from the dissenting opinion of Mr. Justice Frankurter as I believe he concisely states the general rule which I believe to be the guiding principle used by the court in threading its way through difficult and conflicting areas of responsibility:

" 'The principle is thoroughly established that the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.' Chief Justice Hughes in *Kelly* v. [*State of*] *Washington ex rel. Foss Co.,* 302 U. S. 1, 10, 58 S. Ct. 87, 92, 82 L. Ed. 3. It is clear from the decisions just canvassed that the States are not precluded from enacting laws on labor relations merely because Congress has—to use the conventional phrase—entered the field. It is equally clear that the boundaries within which a State may act are determined by the terrain and not by abstract projection. Emphasis in the opinions has varied, but the guiding principle is still that set out in the first in the series of immediately relevant cases: whether 'the state system of regulation, as construed and applied here, can be reconciled with the federal Act * * * and since the two as focused in this case can consistently stand together * * *.' *Allen-Bradley Local* [*No. 1111*] v. *Wisconsin* [*Employment Relations*] *Board,* supra, 315 U. S. [740,] at page 751, 62 S. Ct. [820], at page 826 [86 L. Ed. 1154]. The adjustment thus called for between State and National interests is not attained by reliance on uncritical generalities or rhetorical phrases unnourished by the particularities of specific situations."

I could select any one of the many classical phrases used in the cited cases to state the basic principle, but perhaps I can do no better than to take the one announced in the first and last cases as the rule by which I test the facts of this case. If I do that, the test is: Can our statute, as construed by us, be reconciled with the Federal act so as to permit both to stand?

I have no hesitancy in proclaiming that under certain factual situations they can, and this is true in this case, if we do not consider the specific contents of the assignment. There could be little question about the validity of our act if it were being tested by an assignment of a judgment, which is permitted by Section 302(c) (2) of the Federal act. The collision, if any, approaches because of the subject matter of the assignment.

I shall attempt to explain my views by figuratively placing the Taft-Hartley Act over our statute. I used this method of illustration because our act was first in time and would be enforceable until such time as the paramount Federal act became the law. The subsequent passing of the paramount law would bar enforcing the irreconcilable portions of our act, and so we can consider those as having been completely covered. Accordingly, in those instances where the Taft-Hartley Act prohibits the payment of money by an employer, our act would be out of view. In those areas not expressly in conflict but where the enforcement of our act would defeat the purpose and intent of Congress, our act would likewise be blocked from view. However, the provision dealing with exceptions leaves a vacant space in the Federal act, which permits unimpaired vision of our statute. If this illustration aptly portrays the thought I am trying to convey, then the uncovered part of our act outlines the circumference of the field in which this state can act.

Section 49-14-1 of the Utah statute requires that the employer honor all assignments if the amount of money

assigned does not exceed 3 per cent of the employee's salary. This is the format of the bottom act. The Federal law starts out by prohibiting all payments made to labor organizations. If this broad provision stood alone, then our act would have been entirely covered. However, the exceptions of the Federal act are of particular significance. The exception herein involved is, in substance, that the provisions of that act shall not apply with respect to the payment of money for membership dues, provided the employer receives a written assignment which is not irrevocable for a period of more than one year or beyond the termination of the collective agreement, whichever occurs sooner. It thus appears to me that Congress intended to project the Federal Act on the "dues field" only to the extent of requiring a revocable assignment. For the purposes of this case, and in this field, this is as far as our act has been blocked out. The rest stands clearly visible.

The last question then brings into focus the particular assignment in question. It is at this point that I believe we we must go outside the record to review the contents of the written document. It would have been much better had this case been tried and evidence introduced or the facts stipulated, particularly with respect to the items included in the $4 figure. There is a phrase in this assignment which states that the monthly amount is for dues, which includes initiation fees, fines and assessments. This phrase does not say nor infer that any fines have been imposed or assessments levied. There is a passbook which, like the assignment, was introduced in evidence in the City Court, and which shows no entries in the section requiring the posting of fines. Moreover, it would seem difficult to anticipate fines and include them in a fixed monthly payment, particularly where, as here, the employee had just become a member of the union. To say the least, it would have been helpful to know whether initiation dues, fines, and assessments are included in the $4 amount mentioned. If they were, it might be necessary for this court to determine the intent

of Congress when it used the word "dues." If there have been no fines and assessments levied, this problem would not present itself. In one of the briefs there is mention made of a letter by the Attorney General announcing his belief that Congress intended dues to include initiation fees and assessments. Be that as it may, I lean towards the concept that if the defendant seeks to escape the penalty of our statute by claiming protection under the Federal act it must affirmatively appear that a violation of the Federal act is involved. Holding as I do that the two acts can be reconciled, I fail to see how it affirmatively appears from this record contrariwise.

I would, therefore, reverse the judgment with directions to the trial court to further proceed in a manner not inconsistent with the views herein expressed.

WADE, J., concurs in the opinion of LATIMER, J.